(C.D. 3508)

UNITED PURVEYORS, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 2, 1968)

*Heiman & Crary* (*Eugene C. Heiman* of counsel) for the plaintiff.
*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges; LANDIS, J., concurring

RICHARDSON, Judge: The merchandise of these protests, consolidated for trial, is described on the invoices as "Melonies" and "Home Garden" and "Native" melons. The melons were exported from Panama, entered at Miami, Florida, and classified in liquidation as "cantaloupes" not entered during the period from August 1 to September 15, inclusive, under the provisions of 19 U.S.C.A., section 1001, paragraph 752 (paragraph 752, Tariff Act of 1930) and assessed for duty at the rate of 35 per centum ad valorem. The plaintiff-importer claims that the melons are dutiable as "other melons" under the provisions of paragraph 752 as modified by T.D. 51802 at the rate of 17½ per centum ad valorem.

The competing tariff provisions read as follows:

[Paragraph 752 – 1930 Act]

Fruits in their natural state . . . and not specially provided for . . . 35 per centum ad valorem. . . .

[Paragraph 752 – as modified]

Fruits (except watermelons) in their natural state, not specially provided for:

Cantaloups, when entered during the period from August 1 to September 15, inclusive, in any year_____ * * *

Melons, other than cantaloups, when entered during the period from December 1, in any year, to the following May 31, inclusive_____ 17½ ad val.

The issue before the court here is whether the involved melons are cantaloups. The importer contends that the melons at bar are not cantaloups, while the Government contends that they are.

In support of its contentions the importer adduced the testimony of three witnesses at the trial, documentary evidence; and, for comparison purposes, introduced into evidence samples of melons other than the type imported, the imported melons not being available for inspection by the court. Carl Susskind, secretary-treasurer of the importer, testified, among other things, that he examined the melons covered by the involved entries when they were received in Miami, and found that they were of the Honey Rock variety, that the meat of the melon is pinkish in color and of a looser texture than the meat of the honey dew melon identified as plaintiff's exhibit 2, that the imported melon is round, has very smooth skin which feels silky to the touch and is tender and easy to penetrate, that the melon ranges in color from a light green to a very dark green, is generally from 6 to 9 inches in diameter although some of the melons are larger, that the name generally used in the trade in 1963 for these melons was Honey Rock melons, that that is the name by which his company sold them, and that he has never heard them referred to in the trade as a cantaloup. It was brought out on cross-examination of Mr. Susskind that the importer sells melons to the buying offices of companies such as A & P, Safeway, and Kroger, and that delivery is made by the importer to the Pompano (Florida) area where the melons are loaded onto trucks destined for various parts of the country.

Dr. Calaway H. Dodson, a taxonomist and an associate professor and curator of herbarium at the University of Miami, testified as to the botanical classifications and groupings of melons, pointing out, among other things, that he had examined a melon answering the description given by Mr. Susskind with respect to the imported melons and had determined that it did not belong to the subspecies *cantalupensis* of the species *cucumis melo* (the subspecies for melons of the cantaloup family). Dr. Dodson testified on cross-examination that he had done very little research on melons, that his testimony was based on botanical information gained from textbooks, and that he had no experience in the commercial field of growing or dealing in melons.

Vincent Parlato, a buyer of fresh produce and vegetables in the employ of the plaintiff-importer, testified that he personally observed and inspected the imported melons here involved when they were received, that the melons were 6, 7 to 12 inches and larger in diameter, they were round, with skin texture on the soft side—"soft to the touch . . . you could compare it to putting your finger almost like a ripe banana where you could squeeze it"; that color varied from a very

light yellow to different stages of green—from a light to a dark green, with most of the melons being of the darker green type than of the yellow, that netting was sparse and irregular, that the meat was very smooth and soft textured and pinkish in color, that the melons are called "Rock melons" or "Honey Rock", and that he does not know of any occasion when the melons were referred to as cantaloups. And in response to the court's inquiry, Mr. Parlato stated that he has eaten Rock melon and cantaloup as identified in plaintiff's exhibit 3, and that he prefers cantaloups—they have a sweeter taste.

The Government called as a witness one Dr. Frank S. Jamison, horticulturist at the Institute of Food and Agricultural Sciences, University of Florida, and adduced certain documentary evidence. Dr. Jamison testified, among other things, that he has worked with producers and growers of vegetables, advising and counseling them on market conditions for growing and marketing their products, which products include melons, that a Honey Rock melon is known in certain parts of the United States as a cantaloup, the name "Honey Rock" being synonymous with the name cantaloup, that this is not to say that the melons imported in this case and called "Honey Rock" are the "Honey Rock" melons about which he is testifying, that he has never seen the involved melons, has never been in Panama and is not familiar with the melons grown in Panama and called "Honey Rock", and has assumed that such Panama grown melons are the same as the domestically grown "Honey Rock" melons, and that in order for one to make a proper identification of a particular melon, it is usually necessary for one to see the melon. Dr. Jamison also testified that he does not agree with the attempt of botanists and the United States Department of Agriculture to classify melons below the genus level.

The record also shows that the examiner described the involved melons as "Cantaloupe-type Melons from Panama" in the customs form 5555 notice sent to the plaintiff and depicted in plaintiff's exhibit 1. And in the Agriculture Handbook No. 216 on Muskmelon Culture published in 1961 by the United States Department of Agriculture, received in evidence as defendant's exhibit C, the following statements appear on page 2 under the heading "VARIETIES AND STRAINS":

. . . From a botanical standpoint the term "cantaloup" applies only to melons with a rough, warty surface, pronounced ribs, and a hard rind. They belong to a botanical variety, *cantalupensis*, which is not grown in the United States. However, the melons with netted, green and yellow-green rinds of the botanical variety *reticulatus* are called cantaloups by the American public, growers, and the marketing trade . . . .

The foregoing constitutes the sum and substance of the evidence bearing on the nature and identity of the melons at bar. At the con-

clusion of the case counsel for the plaintiff moved to have stricken from the record defendant's exhibit A, which is a contract not covering the importations before the court, dated July 29, 1963, between the plaintiff and Quinonez Hermanos, S.A., of San Salvador, El Salvador, covering the purchase by plaintiff of certain types of melons, among other things. Counsel argued that exhibit A covered melons other than those here involved which were imported from another country. The trial court reserved decision on the motion for disposition by the division.

The motion to strike exhibit A is denied. Exhibit A was admitted into evidence by the trial court over objection seasonably made by plaintiff's counsel; and we think exhibit A was properly received into evidence by the trial court. The contract, admittedly signed by the witness Susskind, was offered on cross-examination of the witness Susskind by counsel for the Government for the purpose, as we gather from the record, of impeaching or discrediting Susskind's testimony that he had not referred to certain varieties of melon (named in the contract) as cantaloups, when the contract indicated that he had made such reference. In our opinion this was a proper purpose and circumstance for the use of the contract, even though it was entered into subsequent to the importations in issue; and the merchandise was from the country of El Salvador rather than Panama.

As can be seen from the texts of the competing tariff provisions hereinbefore noted, the term "cantaloup" is a term which was used to express a concession negotiated under the General Agreement on Tariffs and Trade, or GATT as it is so often referred to, and carried into effect pursuant to Presidential proclamation issued March 8, 1949 (T.D. 52167). Hence, it is the intention of the negotiators of the trade agreement in the use of the term "cantaloup" that is of controlling importance here. *Cf. United States* v. *Mercantil Distribuidora, S.A., et al.,* 45 CCPA 20, C.A.D. 667. Unfortunately, the briefs of counsel make no reference to the history behind the trade agreement negotiations culminating in the concessions made for "cantaloups" and other melons, and our own research has not disclosed any data bearing directly upon the intent of the negotiators of GATT.

Webster's New International Dictionary (1934 edition) offers the following definitions:

cantaloupe, cantaloup . . . *n.* . . . *Bot.* a A variety (*Cucumis melo cantalupensis*) of muskmelon having a hard warty rind and reddish-orange flesh, chiefly grown in Europe; a rock melon. The flesh when ripe is eaten raw as a fruit. b Loosely, any muskmelon. See MUSKMELON.

. . . muskmelon . . . *n.* . . . The fruit of the plant *cucumis melo* or restrictedly that of the variety *C.m. reticulatus;* also, the plant itself.

. . . Broadly, Muskmelons are of three general types specified as *muskmelons*, *cantaloupes*, and *winter melons*. In the United States, there is no clear distinction between the first two types, although the netted varieties, as Rocky Ford, are generally known as *cantaloupes*. . . .

And in Funk & Wagnalls New Standard Dictionary (1946 edition) we note the following definition:

cantaloup . . . *n.* A variety of muskmelon, having a yellowish or pale-green skin and reddish flesh. You call all kinds of melons *cantelopes* in Philadelphia, but permit me to say that is a local error. F.S. Cozzens *Sparrowgrass Papers* p. 134. [D.&J. 1856.]

As previously indicated herein we have no direct data as to the trade agreement negotiators' intent. However, information compiled and published by the Tariff Commission shortly after GATT (but reflecting trends in the production and distribution of melons prior to the trade negotiations) gives some indication of their concern. The Tariff Commission reported: [1]

"Melons, other than watermelons" includes all melons popularly designated as cantaloups or muskmelons. The trade recognizes five distinct types, namely, cantaloups, honeydews, honeyballs, casabas, and Persians. United States production (1934–43 average) is distributed among the five types as follows: cantaloups (including the small production of casabas and Persians), 77 percent; honeydews, 20 percent; and honeyballs, 3 percent. In this country production of cantaloups is the most widely distributed and production in the Eastern States consists almost entirely of this type, but about 50 percent of the domestic production of cantaloups is in the dry regions of California, Arizona, and Colorado. There is considerable production of honeydews in Colorado and Arizona, but more than 70 percent of the United States output is in California; nearly all the domestic honeyballs, casabas, and Persians are produced in California. The domestic shipping season begins with cantaloups from the Imperial Valley in May and ends for all types and districts in October.

Exports consist of all types, 93 percent of which in 1937–39 went to Canada. In some years exports to Mexico were larger than imports from Mexico.

In 1937–39, 97 percent of the imports consisted of honeydews from Chile and Argentina. These melons entered the United States during January–May, heaviest shipments being in February–April, and did not compete with the domestic shipments. Imports from Mexico consisted of cantaloups arriving mostly in April and May, and of honeyballs and honeydews arriving in June and July. These imports were marketed during the season of the earliest domestic shipments, although they began somewhat earlier than domestic shipments of the corresponding types. During the war, imports from Mexico increased

---

[1] Summaries of Tariff Information (1948), Schedule 7, Part 4, Fruits and Fruit Products, pages 177–178.

because of the high price obtainable in the United States, whereas those from Chile ceased because of the shipping shortage. Imports from Spain and Portugal consisted of an elongated or Spanish type of casaba melon imported late in the year for the holiday trade.

In the Geneva agreement the duty on cantaloups was reduced from 35 to 25 percent ad valorem on imports entered in any year in the period August 1 to September 15. The agreement also provides for a reduction in the duty on melons other than cantaloups from 35 to 17½ percent ad valorem on imports entered in any year in the period December 1 to May 31; the reduced rate, however, was not made effective on January 1, 1948, pursuant to article 27 of the agreement. The duties on cantaloups and other melons entered during periods other than those specified above were not affected by the Geneva agreement.

It seems clear from the above "comments" of the Tariff Commission upon paragraph 752 that the United States trade agreement negotiators went to the negotiation table with the thought in mind of protecting the domestic melon industry from rising competition which it faced from increased importations of cantaloups and other melons especially from Mexico during the shipping seasons for domestic melons. And it appears that the means employed by our negotiators at Geneva to achieve stabilization of the domestic melon industry was the proffering of concessions in the form of reduced seasonal rates of duty, in effect during the off seasons for domestic melons.[2] Thus, the concern of the negotiators of GATT appears to have been with imports of cantaloups, among other melons, which competed with *domestically produced* cantaloups.

The defendant's witness, Dr. Jamison, admitted that it is usually necessary to examine a melon before one can determine whether it is a cantaloup. Consequently, the advantage here favors the importer inasmuch as at least two of the importer's witnesses, to the exclusion of the other witnesses who testified, had seen and examined the involved melons in the condition as imported. Both of these witnesses testified to the effect that the melons at bar are not known as cantaloups. Moreover, the attitude of the examiner who had to inspect the involved melons as part of his job is anything but convincing that the melons are in fact cantaloups by American standards. The statement in exhibit 1 referring to the melons at bar as "Cantaloupe-type Melons" is not, in our opinion, an indication that the appraising officer considered the melons to be "cantaloups". At the very least the statement is ambiguous. An "object-type" does not connote the same as a specific "object". There is nothing of record to show that the advisory classification of the appraising officer was not relied upon by the collector.

---

[2] See U.S. Tariff Com. Report to House Ways & Means Comm. on Investigation No. 332–39 covering Certain Fruits and Vegetables (Sept. 1961) page 8.

Dr. Jamison does indicate that the name Honey Rock is synonymous with the name cantaloup in the Midwest. But this would not and does not mean, as the witness himself indicates, that the name Honey Rock is standardized in its meaning.

Characteristics of a cantaloup as stated in the lexicons, in defendant's exhibit C published by the United States Department of Agriculture, and by three of the four witnesses, are a hard (or rough) warty rind (or surface), pronounced ribs (or netted or webbed), having a yellowish or pale green skin (or yellow green rinds). The Honey Rock melon, according to those testifying who had seen it, is light green to dark green in color, with a smooth surface that feels silky and is tender and easy to penetrate. One witness said the cantaloup has a sweeter taste than the Honey Rock melon. Contrasting these descriptions as to what is a cantaloup and what is a Honey Rock melon, and viewing the evidence of record on the whole, we think the plaintiff-importer has made a *prima facie* showing that the imported melons are not cantaloups within the meaning of paragraph 752 as modified; and there is no evidence to the contrary. That the subject melons are in fact melons, and that such melons were entered for consumption between December 1 and the following May 31 is not questioned. Therefore, for the reasons stated, the protests are sustained.

Judgment will be entered accordingly.

CONCURRING OPINION

LANDIS, Judge: I concur in the result.